Filed 7/1/25  P. v. Caradine CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTOINE DEMETRIUS CARADINE,<br><br>Defendant and Appellant. | F087409<br><br>(Super. Ct. No. F22907489)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Spolin and Dukes, Aaron Spolin, and Caitlin Dukes for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

A jury convicted defendant Antoine Demetrius Caradine of the murder of Darnell Johnson[1] after he shot and killed Darnell during a party at a motorcycle club. Defendant argues that (1) his conviction is not supported by sufficient evidence, (2) the trial court abused its discretion in denying his motion for mistrial, (3) counsel was ineffective in failing to present expert ballistic and self-defense testimony, and (4) the trial court abused its discretion by denying his motion to disclose juror information. We affirm the judgment.

**PROCEDURAL BACKGROUND**

The District Attorney of Fresno County filed an information on February 6, 2023, charging defendant with murder (Pen. Code, § 187, subd. (a))[2] and alleging he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). Defendant pleaded not guilty and denied the firearm enhancement allegation. After a 12-day trial, the jury convicted defendant of murder and found true the firearm enhancement allegation on May 3, 2023. The trial court denied defendant's motions for juror information and for new trial. On December 21, 2023, the trial court denied defendant's motion to strike the firearm enhancement, sentenced him to a total term of 40 years to life in prison, and ordered him to pay $12,818 victim restitution (§ 1202.4, subd. (f)), $300 restitution and stayed parole restitution fines (§§ 1202.4, subd. (d), 1202.45), a $40 court operations assessment (§ 1465.8), and a $30 criminal conviction assessment (Gov. Code, § 70373).

Defendant filed this timely appeal on December 28, 2023.

---

[1] Because witness Darneisha Johnson and victim Darnell Johnson share a last name, we refer to them by their first names for clarity. We refer to other parties by their first names or monikers because their full names were not included in the record. No disrespect is intended.

[2] Undesignated statutory references are to the Penal Code.

# FACTS

Fresno Police Officer Melvin Zamora and his partner were on patrol on October 1, 2022. At approximately 2:45 a.m., they observed 30 to 40 motorcycles leaving the parking lot of an empty warehouse being used by the Soul Brothers Motorcycle Club. Someone flagged them down and reported that three gunshot wound victims were in the parking lot. Zamora observed victim A.P. on the ground with gunshot wounds on his right hip and abdomen and provided aid after calling for an ambulance. Victims M.G. and Darnell were taken to the hospital. Darnell was pronounced dead at 3:14 a.m.

Responding detectives and officers described observing cups, broken beer bottles, motorcycles, clothes, bullet fragments, and spent shell casings throughout the parking lot. The debris indicated there had been a party at the location. Prior to the party, the individuals involved participated in a large annual or semiannual motorcycle run.

Detective Mark Yee investigated the shooting with his partners, Detectives Christopher Franks and Ben Barnes. The crime scene was located to the east of the building, and they located 10 ballistic casings. Forty-five-caliber casings were found in the area near Darnell.

Five or six surveillance cameras were mounted on the east and north sides of the building, and Detective Yee obtained surveillance video recorded from about 2:30 a.m. to 2:50 a.m. The video shows the victims who were shot and the individuals involved in shooting them. After obtaining additional hours of surveillance video from an elementary school across the street, Detective Yee identified the suspects' vehicle, a black Tesla, which arrived at 1:17 a.m., and its three occupants as they entered the parking gate to the property. After viewing the surveillance videos several times, Detective Yee identified defendant as the individual who shot Darnell. Defendant entered the gate at approximately 1:24 a.m. with two others.

In reviewing the surveillance video from the party, Detective Yee observed signs of a disagreement approximately 10 minutes before the shooting. At approximately

3.

2:32 a.m., defendant crossed in front of Darnell as defendant walked to join another group and conversed with an individual in a white hooded sweatshirt. Darnell joined the discussion, and additional individuals surrounded them. Defendant and Darnell had "words" but did not appear to touch each other. An individual stepped between the two men as the conversation continued for approximately four or five minutes. M.G. interjected himself into the conversation with Darnell, they exchanged words and eventually faced each other. At approximately 2:34 a.m., people attempted to restrain Darnell from M.G., but no punches were thrown, and Darnell walked away.

Darnell stopped and was involved in another heated conversation before walking away to the fence line at the end of the parking lot. Darnell and some other individuals moved to the fence line at end of the parking lot, and defendant followed. As other individuals moved to Darnell's location, defendant walked away.

Defendant moved toward Darnell, who was surrounded by a crowd, but stood away from the disturbance around Darnell and made his way behind a pickup truck. Darnell backed away from the group and was surrounded. Two individuals grabbed and shoved him, including the individual in the white hooded sweatshirt with whom Darnell appeared to argue with earlier. The two individuals pulled at Darnell as he stepped backwards, attempting to avoid them. Darnell shoved one of the individuals and freed himself.

Defendant moved around the crowd but then hurried to the area on Darnell's left side as Darnell faced the crowd. Defendant tucked a large necklace he was wearing into his shirt. As Darnell continued to walk backward, he reached into his vest. M.G.'s brother was behind Darnell. Defendant was on Darnell's left and moved forward, adjacent to Darnell. At 2:42 a.m., defendant raised his left hand and fired four shots at Darnell, seen as muzzle flashes in the video. Darnell did not have his firearm out or pointed at anyone at the time that he was shot.

4.

Defendant ran away as Darnell fell to the ground, removed his right hand from his vest, and fired back at defendant. One of Darnell's shots hits A.P. who was standing north across the parking lot. After Darnell fell to the ground, Darneisha (Darnell's sister) picked up the firearm and gave it to another individual who walked out the camera's view.

After Darnell was shot, an individual wearing a light blue shirt and matching shorts (who had been present at the earlier disturbances) took cover behind some motorcycles and fired two shots toward the area where Darnell and defendant had been. Nine-millimeter casings were found in this area. Shortly thereafter, a woman fired twice and hit M.G. Eventually, individuals placed Darnell into a pickup truck and drove off.

Defendant ran with a firearm in his left hand and then exited the parking lot with other party goers. Eventually, the Tesla is seen driving away.

After identifying the Tesla as the suspect vehicle, Detective Yee consulted with other homicide detectives to identify it, including Detective Scott Gray. Detective Gray recognized the Tesla from another investigation in which it had been impounded and photographed. Detective Gray advised that the vehicle was registered to defendant's girlfriend and driven by defendant. Detective Yee concluded that the Tesla in both investigations were similar. Detective Yee attempted to locate the Tesla at the registered address but was unsuccessful until he ran the license plate through a system that showed the Tesla traveled through Madera right after midnight on October 2, 2022, and then between Sacramento and Reno, Nevada until October 6, 2022. The Tesla was eventually located and impounded in Roseville. Detectives Yee and Frank contacted defendant in Roseville and, while searching the Tesla, found a wallet with defendant's credit card and a flyer for the motorcycle run at which Darnell was killed that also included a photograph of defendant.

Darneisha attended a party with her father and Darnell prior to arriving at the Soul Brothers Motorcycle Clubhouse. She was there a few hours and saw defendant at the

party. Defendant and Darnell had a conversation after which, they shook hands. Darnell told her that he had apologized. At approximately 12:00 a.m., they went to the Soul Brothers Motorcycle Clubhouse. Darnell appeared in a calm mood and mingled with other party goers. Darnell walked over to defendant who, with his friends, had approached another individual named Tiontay. Darnell told defendant, "[W]e're not going to have all of that," and tried to diffuse the situation. However, defendant and his friends were aggressive and did not accept what Darnell said. Darneisha walked over to Darnell when she saw them "coming at [her] brother." Tiontay's mother approached and told Darnell that she was "cool" with defendant.

Darneisha tried to walk Darnell to his motorcycle so that they could leave, but the crowd got in the way. Darnell told M.G. that things were okay and tried to shake his hand, but M.G. refused. She tried to leave with Darnell, but the crowd grew to approximately 20 people who continued toward them. Darneisha felt as if the crowd was trying to ambush Darnell. Darnell moved away from the group and pushed at them. Darneisha saw Patrick Dixon charge Darnell from behind. M.G. and defendant were on each side of Darnell. Defendant pointed his gun at Darnell and fired. Darnell fell to the ground, and Darneisha blacked out until she tried to resuscitate him. She picked up Darnell's gun and handed it to someone. Although she had seen Darnell reach into his vest, she told Detective Yee that she did not know Darnell had a gun. She and others helped Darnell into a truck and drove him to the hospital.

Detective Franks responded to the hospital where Darnell was pronounced dead and waited for the coroner. He obtained Darnell's personal effects, including a magazine loaded with 24 rounds. He attended the autopsy and noted Darnell had a round wound on the left side of his chest and two on his right thigh.

Dr. Angelle Chen, a forensic examiner employed by the Fresno County Sheriff Coroner's Office, performed the autopsy on Darnell's body. She located six gunshot wounds. The first gunshot wound was next to his right ear, and the bullet was lodged

6.

close to the surface. The second was an entrance wound in his upper left chest that passed through his ribcage, heart, right lung, and lodged in his right posterior chest wall. Dr. Chen recovered a large-caliber bullet from Darnell's right posterior chest wall.[3] The bullet entered Darnell's left side, pierced his heart and right lung, and killed him. The third gunshot wound was caused by a medium-caliber bullet that entered his right buttock and moved to his left hip where it was recovered. The fourth gunshot wound was caused by a large-caliber bullet that penetrated the area between the top of his thigh and torso and lodged into the back of his pelvic area. The fifth gunshot wound was in his left hand, and the sixth was in the upper-mid part of his right thigh. Darnell died as a result of the second gunshot wound in his chest.

Dr. Chen could not determine the total number of bullets that entered Darnell's body, as one bullet could have caused both an entrance and exit wound or entered into another part of the body as well.

The defense investigator testified that he took photographs of defendant showing defendant had a healing gunshot wound located to the left of his navel and above his waistband area.

Defendant testified that he was at the Soul Brothers Motorcycle Clubhouse on October 1, 2022, after the Halfway Motorcycle Run. As the sergeant at arms for his motorcycle club, defendant was responsible for making sure the other members avoided conflicts and did not drink too much.

Defendant did not have any misunderstanding with Darnell and, earlier in the evening, had exchanged condolences with him. Defendant testified that he shot Darnell because, at the time, defendant believed Darnell was reaching for a weapon and defendant and M.G. were in danger. Darnell and M.G. had a misunderstanding involving

---

[3]     Detective Yee testified that a large-caliber bullet describes a .40-caliber bullet or greater. A medium-caliber bullet describes a nine-millimeter or .38-caliber bullet.

7.

M.G.'s cousin, Tiontay. According to defendant, a group of individuals were trying to explain to Darnell that there was no altercation but just a misunderstanding among family members. Darnell pushed Tiontay, M.G., and Prada, another Soul Brothers Motorcycle Club sergeant at arms. Prior to the shooting, Darnell had opened his vest and showed defendant that Darnell had a firearm in his pocket. During the final altercation, defendant saw Darnell put his hand into his vest and start to pull out a gun. Defendant fired at Darnell because he feared that Darnell would shoot him or M.G. Defendant ran away because Darnell was shooting at defendant, and then defendant was grazed by a bullet. Defendant did not know the other individual who fired at Darnell and was dressed in blue.

Defendant testified that during the altercation, he tucked his necklace into his shirt because he "paid a lot for it" and "didn't want it to get snatched in a fight, breaking up a fight." He intended to break up the fight by pushing people away, but they did not start fighting. Defendant only pulled the gun from inside his waistband after he saw Darnell reach into his vest.

Defendant admitted that, as a convicted felon, he could not possess a firearm but carried one anyway. He brought the firearm to the party because violence occurs at such events, and he was prepared to use the gun if he needed. Defendant testified that he visited a friend after the shooting and left the gun there, where it was then stolen. Defendant never reported the shooting to the police because he saw the police arrive when he left the party and did not want to distract them. Defendant did not go to the hospital for his injury because it was not serious and was not trying to avoid the police.

# DISCUSSION

## I. *Sufficient evidence supports defendant's conviction for second degree murder and the jury's rejection of his claims of perfect and imperfect self-defense.*

### A. Applicable Law and Standard of Review

Defendant argues that the evidence was insufficient to prove that he did not kill in self-defense because "the jury disregarded video evidence and [his] testimony that [he] lawfully exercised his Second Amendment right to defend himself and others." He also argues that the evidence did not establish that his firearm fired the bullet that killed Darnell.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Resolving conflicts and inconsistencies in the testimony is the jury's "exclusive province." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; see *Young*, at p. 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.)

We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar, supra*, 51 Cal.4th at p. 60.) If more than one inference may reasonably be drawn from the evidence, we

accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

The reviewing court need not address "assertions of conflicts in the evidence" or "alternative theories regarding the inferences that should have been drawn from the evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; accord, *People v. Manibusan, supra*, 58 Cal.4th at p. 87.)

A defendant is not guilty of murder if the killing was justified by self-defense. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*Ibid.*) If the belief subjectively exists but is objectively unreasonable, then the doctrine of imperfect self-defense applies, and a killing that would otherwise be murder is reduced to voluntary manslaughter. (*Ibid.*) "[A]ny right of self-defense is limited to the use of such force as is reasonable under the circumstances." (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

" ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) Whether a defendant acted in self-defense may turn on various factual issues, which are normally resolved by the jury. For example, these may include whether the circumstances would cause a reasonable person to perceive the necessity of self-defense, whether the defendant actually acted in defense of himself, and whether the force he used was excessive. (See *People v. Clark* (1982)

10.

130 Cal.App.3d 371, 378, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

### B. Analysis

We disagree with defendant's argument that the evidence was insufficient to prove that defendant did not act in self-defense or imperfect self-defense.

The court instructed the jury with CALCRIM No. 505 on principles of justifiable homicide in self-defense. The court properly instructed the jury that the burden was on the prosecution to prove beyond a reasonable doubt the homicide was not justified. (See CALCRIM No. 505; § 189.5, subd. (a).) The court also instructed the jury with CALCRIM No. 571 on imperfect self-defense, including the prosecution's burden to prove beyond a reasonable doubt that the killing was not done in the actual, though unreasonable, belief in the need to defend against being killed or suffering great bodily injury. Thus, by finding defendant guilty of Darnell's murder, the jury necessarily concluded the prosecution had met its burden regarding self-defense and imperfect self-defense. The common element between both defenses is that defendant must have genuinely believed in the need for self-defense.

The record contains substantial evidence to support the jury's rejection of self-defense and imperfect self-defense, and that defendant did not believe in the genuine need to defend himself. Darneisha testified that Darnell was not the aggressor in the confrontations preceding the shooting. She also testified that Darnell did not display a weapon or assault defendant or M.G. The video shows Darnell being assaulted and surrounded by more than 10 individuals, including individuals associated with defendant. As the altercation progressed, defendant moved toward it and, by his own testimony, tucked his valued necklace into his shirt in anticipation of a physical altercation in which he intended to participate. Defendant stayed on the periphery of the group of attackers and moved in unison with Darnell. Defendant then raised his arm immediately, supporting an inference that defendant had the gun in his hand already, and shot Darnell

11.

at the same time that Darnell looked toward defendant and reached into Darnell's vest. The jury could have concluded that defendant was prepared to shoot Darnell before Darnell reached into his vest or that Darnell reached for a firearm because he saw that defendant had a gun. Additionally, Darnell was being confronted and surrounded by an apparently angry crowd, and the jury could have concluded that Darnell's actions were justified as self-defense.

The video and Darneisha's account of the shooting do not prove as a matter of law that it was "physically impossible or inherently improbable" that defendant acted in self-defense. (*People v. Young, supra*, 34 Cal.4th at p. 1181.) Sufficient evidence supports a finding beyond a reasonable doubt that defendant possessed a firearm—and fired it—at a point when Darnell was not a threat to him or M.G., and that defendant thus had no reasonable basis to perceive himself in imminent threat of great injury. (See *People v. Brady* (2018) 22 Cal.App.5th 1008, 1018 [evidence of lack of aggression by assault victim enabled jury to find the defendant did not reasonably perceive imminent threat].) Based on these facts, it was reasonable for the jury to conclude a reasonable person would not have perceived it necessary to fatally shoot Darnell or make the decision to do so before Darnell reached into his vest. (See *People v. Clark, supra*, 130 Cal.App.3d at p. 378 ["Issues arising out of self-defense, including whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself, and whether the force used was excessive, are normally questions of fact for the trier of fact to resolve."], disapproved on other grounds in *People v. Blakeley, supra*, 23 Cal.4th at p. 92.)

Relying on isolated portions of the testimony of prosecution witnesses and his own testimony, defendant argues there was insufficient evidence to justify a rejection of his claim of self-defense. Defendant testified that Darnell was upset at an interaction between Tiontay and M.G. and would not listen as individuals explained that there was no problem. Defendant claimed to see Darnell's firearm in his vest prior to the final

altercation and, when Darnell reached into his vest, believed that Darnell intended to shoot and only then pulled out defendant's own gun and shot Darnell. Therefore, defendant believed he was defending himself and M.G. when he shot Darnell. While we recognize that defendant's account of the events supports his claim of self-defense, we disagree that the circumstances of the shooting were uncontroverted. (See *People v. Davis* (1965) 63 Cal.2d 648, 653 ["Only if the jurors were required to accept defendant's version of the killing would we be inclined to agree with defendant's contention of justification."].) Here, the jury was presented with conflicting evidence as to whether defendant had been threatened and whether he believed that he needed to defend himself or M.G.

As indicated, however, there is substantial conflict in the evidence with respect to whether defendant could have reasonably believed that Darnell was attempting to arm himself with a firearm when defendant fired or whether defendant prepared to shoot Darnell before Darnell reached into his vest. Darneisha testified that Darnell was being ambushed when he was shot. The jury was entitled to disbelieve defendant's testimony, and we defer to the jury's evaluation of his credibility. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Zilbauer* (1955) 44 Cal.2d 43, 48–49 [the jury was not required to accept the defendant's version of the killing].)

Furthermore, even if the jury believed that Darnell was reaching into his vest, it could have concluded that defendant lied when he testified that he believed Darnell was reaching for a weapon. This is a case, " ' "where some of the evidence tends to show a situation in which a killing may not be justified" ' " and not self-defense as a matter of law and, therefore, " ' "the issue is a question of fact for the jury to determine." ' " (*People v. Nguyen, supra*, 61 Cal.4th at p. 1044.) Therefore, the jury could have rejected defendant's testimony that he believed he needed to shoot Darnell to defend himself or that he needed to shoot Darnell four times.

13.

In sum, the jury could have reasonably concluded that defendant (1) did not actually believe in the need to defend himself and (2) used force that greatly exceeded what was reasonable under the circumstances, negating both self-defense and imperfect self-defense. (See *People v. Humphrey, supra*, 13 Cal.4th at pp. 1082–1083; *People v. Pinholster, supra*, 1 Cal.4th at p. 966, disapproved on another ground in *People v. Williams, supra*, 49 Cal.4th at p. 459.) The fact that the record also includes some evidence from which a reasonable jury could have found otherwise does not establish defendant acted in self-defense as a matter of law. This evidence does not conclusively establish that a reasonable trier of fact could have only concluded that defendant shot Darnell in self-defense. (See *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

Defendant's claim that the evidence is insufficient to prove that his bullet killed Darnell similarly fails. The video shows that defendant was on Darnell's left side as he fired four shots at Darnell. Dr. Chen testified that Darnell was killed by a large-caliber bullet, which entered the left side of his body through his chest and lodged in his right posterior chest wall. Her diagram from the autopsy shows that the bullet traveled from left to right at a downward angle after entry. The video shows that the shooter in blue, who fired from the cover of parked motorcycles, was on Darnell's right side at the time defendant fired at Darnell. While Darnell was lying on his stomach on the ground, the man in blue pulled his gun and fired in Darnell's direction. While no firearms were recovered, Detective Yee testified that .45-caliber bullet casings were found in the area of Darnell's body, which are considered "large caliber." Additionally, Detective Yee testified that nine-millimeter casings (characterized as medium caliber) were found in the area from which the man in blue fired his shots. This is substantial evidence that defendant fired the bullet that killed Darnell.

We therefore conclude the jury's verdict is supported by substantial evidence.

14.

## II. The trial court did not abuse its discretion in denying defendant's motion for mistrial.

### A. Background

Detective Gray recognized the black Tesla involved in Darnell's investigation as one also involved in another homicide investigation. To minimize the prejudice from such testimony, the parties reached a stipulation. "Detective Scott Gray with the Fresno Police Department would testify to the following: He reviewed video surveillance collected during the investigation [of Darnell's homicide] and recognized the black Tesla from a separate investigation he was conducting .… The Tesla had been impounded … and was photographed. The registered owner of the Tesla was [defendant's girlfriend] but was known to be driven by [defendant].… The license plate number was …, but previously displayed a temporary license plate number .… And the Tesla had been released to [defendant's girlfriend]."

When Detective Yee was recalled, he testified that Detective Gray worked with him in the homicide unit. Defendant moved for a mistrial and argued that by identifying Detective Gray as a homicide detective, the jury could conclude that defendant was investigated regarding a separate homicide. The trial court noted that the testimony only indicated that Detective Gray was a homicide detective at that time but not that his prior investigation related to a homicide. The trial court denied the motion for mistrial but indicated it would consider admonishing the jury with an instruction crafted by the defense at defendant's request.

During defendant's testimony, he explained that the Tesla was previously impounded to search for evidence after he used it to transport his brother-in-law, who had been shot, to the hospital. Defense counsel did not request an admonition and expressly declined the trial court's offer of a limiting jury instruction regarding Detective Yee's testimony that Detective Gray was currently a homicide detective.

15.

### B. Applicable Law and Standard of Review

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198, third bracketed insertion added.)

The defendant bears the burden to show the trial court abused its discretion in denying his motion for mistrial. (*People v. Maury* (2003) 30 Cal.4th 342, 434–437.) We review a trial court's ruling on a motion for mistrial under the deferential abuse of discretion standard. (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) "To establish an abuse of discretion, [a defendant] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

### C. Analysis

The trial court denied defendant's motion for mistrial after noting that Detective Yee's testimony did not suggest that defendant was the suspect in an earlier homicide, but only indicated that Detective Gray was a homicide detective at the time of trial. Additionally, defendant's testimony further explained that the Tesla has been used to drive his brother-in-law to the hospital for treatment and, for that reason, had been impounded to facilitate a search for evidence as to the shooting. Given the limited nature of the testimony, we conclude that the trial court did not abuse its discretion in denying

defendant's motion for mistrial as it is unlikely that the jury concluded that defendant was under investigation for an earlier homicide.

" 'It is only in the exceptional case that "the improper subject matter is of such a character that its effect ... cannot be removed by the court's admonitions." ' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1429.)  Our Supreme Court has found a timely admonition to the jury sufficient to cure any prejudice in situations involving even more inflammatory statements than in this case.  For example, in *People v. Ledesma* (2006) 39 Cal.4th 641, a prosecution witness mentioned that the defendant had been on death row.  In an effort to explain this reference, the defense counsel asked questions making it clear that the defendant's prior conviction on the same charges had been reversed on grounds that trial counsel had been ineffective.  Our Supreme Court found the trial court did not err in denying a motion for mistrial because there was no basis for concluding that the statement was incurably prejudicial.  (*Id.* at pp. 681–683.)

In a case analogous to the instant case, *People v. Valdez* (2004) 32 Cal.4th 73, the court instructed a police officer to avoid revealing that he interviewed the defendant while the defendant was in custody.  In response to the prosecutor's question about how the interview was conducted, the officer nonetheless testified that the defendant was at a correctional facility.  (*Id.* at p. 124.)  Defense counsel's motion for mistrial was denied because the court found no intentional misconduct.  (*Id.* at p. 124 & fn. 25.)  Our Supreme Court held that the defendant forfeited a claim of prosecutorial misconduct based on this statement because although his counsel objected, he rejected the trial court's offer to admonish the jury.  (*Id.* at pp. 124–125.)  The court found the isolated reference to the correctional facility was not so grave that a curative instruction would not have mitigated any possible prejudice to the defendant.  (*Id.* at p. 125.)

In this case, defendant declined the trial court's offer of a curative instruction and, instead, offered testimony that prevented the jury from speculating that defendant's Tesla was impounded as part of an earlier homicide investigation.  Defendant explained that the

investigation involved the shooting of his brother-in-law, and he drove his brother-in-law to the hospital.  Given these circumstances, we conclude that the testimony did not irreparably damage defendant's chances of receiving a fair trial and the trial court's denial of defendant's motion for mistrial was not arbitrary, capricious, absurd, nor outside the bounds of reason.

## III.     *The record does not permit review of defendant's claim that his counsel was ineffective.*

Defendant argues that his counsel was constitutionally ineffective for failing to call a self-defense expert or ballistics expert.  However, the record does not permit review of this claim on appeal.

### A.     Applicable Law and Standard of Review

Under either the state or federal Constitution, "to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.)  "To demonstrate deficient performance, [a] defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' [Citation.]  To demonstrate prejudice, [a] defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mickel*, at p. 198.)

"[C]ertain practical constraints make it more difficult to address ineffective assistance claims on direct appeal rather than in the context of a habeas corpus proceeding." (*Mickel, supra*, 2 Cal.5th at p. 198.)  "The record on appeal may not explain why counsel chose to act as he or she did.  Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take

certain actions were objectively unreasonable." (*Ibid.*) "Moreover, we begin with the presumption that counsel's actions fall within the broad range of reasonableness and afford 'great deference to counsel's tactical decisions.' " (*Ibid.*)

"Accordingly, [our Supreme Court] ha[s] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*Mickel, supra*, 2 Cal.5th at p. 198.) If the record fails to disclose why trial counsel acted or failed to act in the manner challenged, the ineffective assistance of counsel claim must be rejected unless counsel was asked for and failed to provide an explanation, or there could be no plausible explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

## B.    Analysis

Because the record sheds no light on why counsel did not present a ballistics or self-defense expert, we cannot conclude that there can be no satisfactory explanation for counsel's failure to act. It is possible that defense counsel investigated the possibility of obtaining an expert, but the expert's opinion was not favorable to defendant or would have been more beneficial to the prosecution's case. Additionally, if an expert could not provide favorable testimony, then defendant has not been prejudiced by counsel's action even if he did fail to investigate the possibility of these experts.

Therefore, we conclude that defendant has not demonstrated on appeal that defense counsel was constitutionally ineffective, and the matter is more appropriately addressed in a petition for a writ of habeas corpus should defendant choose to do so. (See *People v. Miller* (1972) 7 Cal.3d 562, 574, fn. 11.)

19.

***IV. The trial court did not abuse its discretion in denying defendant's motion for disclosure of jury information.***

### A. Background

Defendant filed a motion for the release of juror identifying information on June 1, 2023. In support of the motion, defendant provided the declaration of one courtroom observer who witnessed Juror No. 1 "fall asleep" on April 24, 2023. She described that Juror No. 1's head fell to his chest or to the side, and then he jumped and woke himself up. She characterized this as "head-bobbing" but did not provide any information as to the intervals between when Juror No. 1 appeared to sleep and then wake himself. She made these observations during the testimonies of Detective Yee, Dr. Chen, Darneisha, and defendant.[4] A second observer provided a declaration that she made similar observations on May 2, 2023.[5] She described that Juror No. 1 closed his eyes, woke up and shook his head, then closed his eyes, and his head would fall to his chest. She described this happening "off and on the whole time [she] was there," but failed to explain how long she was in the courtroom.

The prosecutor objected to the motion, arguing that defendant failed to establish a prima facie case of juror inattentiveness and the court should find juror safety as a compelling reason to prevent disclosure of the juror information. Defendant's girlfriend had an emotional outburst during the trial that caused the court interrupt the trial and admonish the audience. She was also stopped by security with a firearm in her purse. Additionally, security concerns arose during the verdict reading when Darnell's family and defendant's family were involved in a conflict that required deputies to intervene.

---

[4] Mark Yee's testimony commenced on April 24, 2023, and concluded on April 25, 2023. He was recalled on April 27, 2023, and concluded on April 28, 2023. Darneisha testified on April 25, 2023, following Detective Yee. Dr. Chen testified on April 27, 2023. Defendant testified on April 28, 2023.

[5] On that date, court convened at 9:01 a.m., the trial court instructed the jury, the parties presented their closing arguments, and the jury commenced deliberations at 11:55 a.m.

Subsequently, the jurors were escorted from the courtroom by deputies when their service was complete due to concern for their safety.

The trial court denied defendant's motion on August 18, 2023, and found that defendant failed to make a prima facie showing of good cause because the observers' declarations failed to describe the length of time that Juror No. 1 may have been sleeping. Finding that the description of "nodding off" was too vague to demonstrate that Juror No. 1 was sleeping during the trial, the trial court also noted that it did not observe any juror sleeping during the trial, and neither did the clerk, bailiff, nor either counsel. The court observers failed to come forward during the trial to report their observations. The court noted that no juror expressed concern and even selected Juror No. 1 as the foreperson. The observer declarations established only that a juror was intermittently bobbing his head but did not support a reasonable belief of juror misconduct or that disclosure of juror information would lead to admissible evidence of juror misconduct.

Additionally, the court found a compelling interest against disclosure based upon the violent nature of the charge, the emotional outbursts from defendant's family when the verdict was read, and the need for deputies to intervene and escort the jurors from the courthouse to ensure their safety. The court found that the need to protect the privacy and safety of Juror No. 1 was necessary, particularly because he was the foreperson.

### B. Applicable Law and Standard of Review

After the recording of a jury's verdict in a criminal trial, the court must seal "personal juror identifying information" such as jurors' names, addresses, and telephone numbers. (Code Civ. Proc., § 237, subd. (a)(2); see *People v. Munoz* (2019) 31 Cal.App.5th 143, 165 (*Munoz*).) Following the recording of a jury's verdict in a criminal proceeding, a defendant's counsel may petition the court pursuant to section 237 of the Code of Civil Procedure for access to personal juror identifying information within the court's records "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ.

21.

Proc., § 206, subd. (g).) "The court shall consider all requests for personal juror identifying information pursuant to [Code of Civil Procedure s]ection 237." (*Ibid.*)

A petition pursuant to Code of Civil Procedure section 237 must be supported by a declaration establishing good cause for the disclosure. (Code Civ. Proc., § 237, subd. (b); *People v. Johnson* (2015) 242 Cal.App.4th 1155, 1161–1162.) To demonstrate good cause where a petition for disclosure is to support a motion for new trial based on juror misconduct, a defendant must set forth a sufficient showing to support a reasonable belief that misconduct occurred, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial. (*Munoz, supra*, 31 Cal.App.5th at p. 165.) A defendant establishes good cause for the disclosure of juror information by showing "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493.) The alleged misconduct must be of such character as is likely to have influenced the verdict. (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322.) There is no good cause where the allegations of misconduct are speculative, conclusory, vague, or unsupported. (*Munoz*, at p. 165.)

The trial court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause unless there is a compelling interest against disclosure.[6] (Code Civ. Proc., § 237, subd. (b).) "Compelling interests include jurors' safety and the need for finality if a long period of time has elapsed since trial." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 382.)

---

[6] If a prima facie showing of good cause is made, the court sets a hearing and notifies each affected former juror; any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition. (Code Civ. Proc., § 237, subds. (b), (c).) After the hearing, the records shall be made available as requested in the petition, unless the court sustains a former juror's protest. The court "shall" sustain such a protest if, among other reasons, "the juror is unwilling to be contacted by the petitioner." (*Id.*, subd. (d).) At the hearing, the trial court can ascertain whether the allegation is credible by questioning former jurors.

We review a trial court's denial of a petition for the disclosure of juror information for abuse of discretion. (*Munoz, supra*, 31 Cal.App.5th at p. 165.)

Good cause to remove a juror exists when the juror is sleeping during trial (*People v. Williams* (2015) 61 Cal.4th 1244, 1277; *People v. Thompson* (2010) 49 Cal.4th 79, 137; *People v. Bonilla* (2007) 41 Cal.4th 313, 350) but not when there is a "mere suggestion of juror 'inattention' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 821; accord, *People v. Williams* (2013) 58 Cal.4th 197, 289). When it comes to a sleeping juror, the basis for a demonstrable reality of unfitness exists only when "there is convincing proof the juror actually slept during trial." (*People v. Bowers* (2001) 87 Cal.App.4th 722, 731.)

**C.     Analysis**

The trial court found that the observers' declarations established only that Juror No. 1 was having trouble staying awake but not that he had been sleeping. Even if the declarations are true, they do not establish good cause to doubt that Juror No. 1 was awake during the trial. Mere speculation that a juror might have been sleeping or inattentive is insufficient to provide notice of good cause to discharge and does not obligate a trial court to conduct an inquiry. (*People v. Espinoza, supra*, 3 Cal.4th at p. 821.)

"Although implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. In fact, not a single case has been brought to our attention which granted a new trial on that ground. Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411, disapproved on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574; see *Hasson v. Ford*

23.

*Motor Co.*, at p. 418 ["We take this opportunity to emphasize our unwillingness to allow the impeachment of jury verdicts on a bare showing that some jurors failed to conform their conduct to the ideal standard of utmost diligence in the performance of their duties. Even the most diligent juror may reach the end of his attention span at some point during a trial and allow his mind to wander temporarily from the matter at hand."].)

In this case, the trial court did not abuse its discretion in concluding that defendant's prima facie showing consisted of a juror closing their eyes during testimony for an unknown amount of time. Such conduct is not likely to have impacted the juror's ability to pay attention or to have influenced the verdict. (See *People v. Jefflo, supra*, 63 Cal.App.4th at p. 1322.)

Additionally, the trial court possesses the power to protect the juror's physical safety and privacy. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097 (*Townsel*).) Defendant was convicted of murder, and his family's reaction to the verdict was serious enough that the court had deputies escort the jury from the courthouse. This circumstance raises serious concerns about juror safety. (See *id.* at p. 1097.) Given the speculative nature of the juror misconduct allegation supporting defendant's motion, the trial court did not abuse its discretion in denying defendant's motion based upon its serious concern for the jurors' safety. (See Code Civ. Proc., § 237, subd. (b) [a "compelling interest" justifying nondisclosure of juror identifying information "includes … protecting jurors from threats or danger of physical harm"].) Here, after balancing " 'the privacy, safety and other considerations, … as against the rights of any of the parties to obtain that information based on a showing of need,' " the court made an express finding of a compelling governmental interest with respect to the identifying information of the jurors. (*People v. Avila* (2006) 38 Cal.4th 491, 604, quoting *Townsel, supra*, 20 Cal.4th at p. 1096.)

Under these circumstances, we conclude the court acted within its broad discretion in denying defendant's motion.  (See *People v. Avila, supra*, 38 Cal.4th at p. 604, citing *Townsel, supra*, 20 Cal.4th at p. 1096.)

**DISPOSITION**

The judgment is affirmed.


                                     MEEHAN, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.